RECEIVED

SEP 04 2026

AT 8:30 ____________ M
CLERK, U.S. DISTRICT COURT - DNJ

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES *ex rel.* 19 CATCH, LLC,

Plaintiff,

v.

THE MICHAELS ORGANIZATION, LLC,
MICHAELS MANAGEMENT-AFFORDABLE LLC,
PRESTIGE BUILDING COMPANY LLC,
MICHAELS COMMUNITY SERVICES CORPORATION,
MICHAELS HOSPITALITY LLC,
MICHAELS STUDENT LIVING MANAGEMENT LLC,
MICHAELS STUDENT LIVING LLC,
MICHAELS DEVELOPMENT COMPANY I, LP, and
CONTINENTAL MORTGAGE CORP.,

Defendants.

Civil Action No. ______________

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

31 U.S.C. § 3729-33 *et seq.*

**FALSE CLAIMS ACT COMPLAINT**

19 CATCH LLC ("Relator") brings this action as a *qui tam* relator on behalf of the United States against The Michaels Organization, LLC, Michaels Management-Affordable LLC, Prestige Building Company LLC, Michaels Community Services Corporation, Michaels Hospitality LLC, Michaels Student Living Management LLC, Michaels Student Living LLC, Michaels Development Company I, LP, and Continental Mortgage Corp. (collectively, "Defendants"), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-3733, to recover damages, penalties, attorney fees and costs, and other relief.

**Introduction**

1. The affiliated defendants The Michaels Organization, LLC, Michaels Management-Affordable LLC, Prestige Building Company LLC, Michaels Community Services Corporation, Michaels Hospitality LLC, Michaels Student Living Management LLC, Michaels Student Living LLC, Michaels Development Company I, LP, and Continental Mortgage Corp. fraudulently obtained a total of over $7,260,800.00 in first-draw Paycheck Protection Program ("PPP") loan proceeds, of which SBA forgave, plus stated interest, a total of at least $7,359,210.00.

2. Together, Defendants reported only 471 employees across nine separate first-draw PPP applications, each presented as though the applicant were an independent small business concern. The affiliated enterprise's actual workforce was far larger. The single retirement plan sponsored by The Michaels Organization, LLC reported 1,838 active participants and 1,984 total participants for 2019 and 2,552 total participants for 2020, and the enterprise was publicly described as a company of 1,800 people. The affiliated enterprise was well over the 500-employee cap for first draw PPP loans.

3. Defendants achieved that result by treating separately named companies within the Michaels corporate family as independent PPP applicants, notwithstanding common control, common management, a common Camden headquarters, common operational and financial infrastructure, and contemporaneous evidence that the corporate family employed thousands of persons and managed multi-billion-dollar assets.

4. Upon information and belief, Defendants also did not meet any of the other PPP eligibility criteria for first-draw loans.

5. Had Defendants been candid about their affiliates' employees and receipts on their PPP loan applications, Defendants would not have received $7,260,800.00 in PPP proceeds, and United States taxpayers would have avoided at least $7,359,210.00 in forgiven payments, together with lender processing fees.

6. Relator is an original source of the Complaint allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator's knowledge is independent of, and materially adds to, any publicly disclosed information concerning the corporate structure and management linking Defendants, the common headquarters and centralized administrative functions serving the affiliated enterprise, the consolidated retirement plan and controlled-group representation, the aggregate employee and financial figures, and the resulting size ineligibility. Prior to filing this Complaint, Relator voluntarily disclosed to the Government the facts and evidence underlying these allegations.

7. This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

## **Jurisdiction and Venue**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

9. This Court may exercise personal jurisdiction over Defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because Defendants submitted, or caused the submission of, false claims in this District, and a substantial part of the events or omissions giving rise to Relator's claim occurred in this District. Defendants

reside, transact business, and committed substantial acts alleged herein in this District, including at their common corporate headquarters in Camden, New Jersey.

10. Pursuant to 31 U.S.C. § 3730(b)(2), Relator is serving the United States with a written disclosure of substantially all material evidence and information in Relator's possession and is filing this Complaint under seal. This Complaint shall remain under seal for at least sixty days and shall not be served on Defendants unless and until the Court so orders.

**The Parties**

11. Relator 19 CATCH, LLC ("Relator" or "19 Catch") is a Single-Member Limited Liability Company registered in New Jersey. Relator brings this action based on its direct, independent, and personal knowledge of the facts, and also upon information and belief. Relator is an original source of this information to the United States.

12. Defendant The Michaels Organization, LLC ("TMO") was, upon information and belief, a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden County, New Jersey within this District and elsewhere. TMO publicly stated that it moved its corporate headquarters to Camden in June 2019.

13. Defendant Michaels Management-Affordable LLC ("Michaels Management-Affordable") was a limited liability company that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

14. Defendant Prestige Building Company LLC ("Prestige") was a limited liability company that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

15. Defendant Michaels Community Services Corporation ("MCSC") was a New Jersey nonprofit corporation and an organization described in § 501(c)(3) of the Internal Revenue

Code, operating and transacting business in Camden County, New Jersey within this District and elsewhere. Its Form 990 for the fiscal year ending March 31, 2020 identified a Camden, New Jersey address and Joseph F. Purcell as its principal officer.

16. Defendant Michaels Hospitality LLC ("Michaels Hospitality") was a limited liability company that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

17. Defendant Michaels Student Living Management LLC ("Student Living Management") was a limited liability company that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

18. Defendant Michaels Student Living LLC ("Student Living") was a limited liability company that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

19. Defendant Michaels Development Company I, LP ("Michaels Development") was a limited partnership that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

20. Defendant Continental Mortgage Corp. ("Continental Mortgage") was a corporation that, upon information and belief, was operating and transacting business in Camden County, New Jersey within this District and elsewhere.

21. Defendants TMO, Michaels Management-Affordable, Prestige, MCSC, Michaels Hospitality, Student Living Management, Student Living, Michaels Development, and Continental Mortgage are collectively referred to herein as the "Michaels Entities."

22. At all times relevant to this Complaint, the Michaels Entities were led by a common group of executives. That leadership included founder and chairman Michael J. Levitt, Chief

Executive Officer John J. O'Donnell, President Mark Morgan, Executive Vice President Milton Pratt, Michaels Development President Robert J. Greer, and Chief Financial Officer Joseph Purcell.

23. Manufacturers and Traders Trust Company ("M&T") is the financial institution that processed each of the PPP loans submitted by the Defendants.

**Legal Background**

**A. The False Claims Act**

24. The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

25. For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

**B. The Paycheck Protection Program**

26. In March 2020, through the CARES Act, Pub. Law 116–136, Congress established the PPP to provide economic relief for small businesses during the coronavirus pandemic.

27. Under the first round of the PPP, an eligible business could apply for a loan of up to 2.5 times its average monthly payroll, with a maximum $100,000 annual salary per employee, during the one-year period before the date on which the loan was made, subject to a maximum amount of $10 million. *See* 15 U.S.C. § 636(a)(36)(E); *see also* Small Business Administration ("SBA") Form 2483, Instructions.

28. An applicant for a first draw PPP loan could qualify as an eligible business under any of three standards:

> (1) having an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first draw PPP loan, *see* 15 U.S.C. § 636(a)(36)(D)(i)(I) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 14 (April 6, 2020);
>
> (2) the SBA employee-based or revenue-based size standard corresponding to the business's primary industry, *see* 15 U.S.C. § 636(a)(36)(D)(i)(II) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 2; or
>
> (3) the SBA's alternative size standard, which provided that the business must have (a) a maximum tangible net worth of not more than $15 million, and (b) average net income after tax of not more than $5 million for the business's two full preceding fiscal years as of March 27, 2020, *see* 86 Fed. Reg. 15083, 15085 n.5 (Mar. 22, 2021) *and* SBA, *PPP Loans Frequently Asked Questions*, Question 2.

29. Under each of these eligibility standards, the law required the business to include its affiliates in assessing whether the business met the standard. *See* 15 U.S.C. § 636(a)(36)(D)(iv). The affiliation rule in effect at the time provided that "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.301(f) (2019) (*available at* 81 Fed. Reg. 41423, 41428 (June 27, 2016)). The rule further elaborated that affiliation could arise under various circumstances, including:

> Affiliation based on ownership. For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of

> Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.
>
> Affiliation based on management. Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one o[r] more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement.
>
> Affiliation based on identity of interest. Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially, identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate.

*Id.*; *see also* SBA, *Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program* (April 3, 2020).

30. In guidance that SBA issued on April 6, 2020, the agency included the following:

> **Question:** Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?
>
> **Answer:** Yes. Borrowers must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation. A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable. SBA's existing affiliation exclusions apply to the PPP, including, for example the exclusions under 13 CFR 121.103(b)(2).

SBA, *PPP Loans Frequently Asked Questions*, Question 5 (Apr. 6, 2020).

31. The PPP statute waived the affiliation rules for hotels and food service businesses. Specifically, the PPP statute provided that the SBA affiliation rule was waived for "any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System ["NAICS"] code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iv). (NAICS codes beginning with 72 cover the accommodation and food services industries.) In other words, a restaurant business did not need to consider its affiliates when determining its number of employees for purposes of PPP eligibility. On the other hand, a different type of business that was an affiliate of a hotel or restaurant still needed to consider the hotel's or restaurant's employees in determining its own total number of employees. In a set of Frequently Asked Questions, SBA provided the following example:

> Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another). Company Y owns a restaurant with 400 employees. Company Z is a construction company with 400 employees.
>
> • Company Y is eligible for a First Draw PPP Loan because it has 500 or fewer employees. The affiliation rules do not apply to Company Y, because it has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).
>
> • The waiver of the affiliation rules does not apply to Company Z, because Company Z is in the construction industry. Under SBA's affiliation rules, 13 CFR 121.301(f)(1) and (3), Company Y and Company Z are affiliates of one another because they are under the common control of Company X, which wholly owns both companies. This means that the size of Company Z is determined by adding its employees to those of Companies X and Y.
>
> • Therefore, Company Z is deemed to have more than 500 employees, together with its affiliates. However, Company Z may be eligible to receive a First Draw PPP Loan as a small business concern if it, together with Companies X and Y, meets SBA's other applicable size standards. . . .

SBA, *Paycheck Protection Loans, Frequently Asked Questions* at 12 (Mar. 3, 2021).

32. To apply for a first draw PPP loan, a business would submit an SBA Form 2483 to an authorized lender. The application form required a potential borrower to specify, among other

things, the number of employees, and whether the "the Applicant or any owner of the Applicant [is] an owner of any other business, or have common management with, any other business." The application form further required the applicant to certify, among other things, that:

- "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted,"
- "[t]he Applicant . . . employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry," and
- "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."

33. In December 2020, Congress enacted the Economic Aid to Hard Hit Small Businesses, Nonprofits, and Venues Act, Pub. Law 116-260, Div. N, Tit. III, which, among other things, provided for eligible small businesses to obtain second draw PPP loans. Most eligible businesses could apply for second draw PPP loans of up to 2.5 times their average monthly payroll, with a maximum $100,000 annual salary per employee, during 2019 or during the one-year period before the date on which the loans were made, subject to a maximum amount of $2 million per business. 15 U.S.C. § 636(a)(37)(C)(i); *see also* SBA Form 2483-SD, Instructions. If an eligible small business had a NAICS code that began with 72 (Accommodation and Food Services), then the business could apply for a second draw PPP loan of up to 3.5 times its average monthly payroll during 2019 or during the one-year period before the date on which the loan was made, subject to a maximum amount of $2 million. 15 U.S.C. § 636(a)(37)(C)(iv).

34. An applicant for a second draw PPP loan could qualify as an eligible small business if (1) it had no more than 300 employees on average during the 12 months preceding its loan application or during the period it used to calculate average monthly payroll; and (2) its revenue during any quarter of 2020 was at least 25 percent lower than in the corresponding quarter in 2019.

15 U.S.C. § 636(a)(37)(A)(iv); *see also* SBA Form 2483-SD, Instructions. For purposes of determining an applicant's number of employees, the original PPP affiliation rules applied. 15 U.S.C. § 636(a)(37)(E).

35. To apply for a second draw PPP loan, a business would submit SBA Form 2483-SD to an authorized lender. This form required a potential borrower to specify, among other things, its NAICS code, the number of employees, "all owners of 20% or more of the equity of the Applicant," and whether "the Applicant or any owner of the Applicant [is] an owner of any other business or have common management (including a management agreement) with any other business." On the second draw PPP loan application form, the box for "Number of Employees" specifically said "including affiliates." The second draw application form also required the applicant to certify, among other things, that:

- "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted,"
- "[t]he Applicant, together with its affiliates . . . employs no more than 300 employees," and
- "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."

36. The statutes creating the PPP provided that SBA would reimburse PPP lenders at specified rates for processing loans. As relevant here, the rate for first draw loans of $2 million or more was 1 percent, *see* 15 U.S.C. § 636(a)(36)(P)(i)(I)(cc); 3 percent for first and second draw loans of more than $350,000 and up to $2,000,000, *see* 15 U.S.C. § 636(a)(36)(P)(i)(I)(bb), 15 U.S.C. § 636(a)(37)(L)(ii); and 5 percent for first draw loans of more than $50,000 and up to $350,000, *see* 15 U.S.C. § 636(a)(36)(P)(i)(I)(aa).

37. The PPP allowed full loan forgiveness if borrowers used loan proceeds as required by PPP rules and maintained their employee headcount. *See* 15 U.S.C. § 636m; SBA, *Frequently*

*Asked Questions (FAQs) on PPP Loan Forgiveness* (Oct. 13, 2020). To the extent a borrower reduced its average number of employees after receiving the loan, the PPP reduced the forgiveness amount under a statutory formula. *See* 15 U.S.C. § 636m(d)(2).

**Background on Defendants' PPP Loans**

38. On or about April 28, 2020, SBA approved a first draw loan to Michaels Management-Affordable in the amount of $2,537,200.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Michaels Management-Affordable represented that it had 161 employees. On or about November 23, 2021, SBA forgave Michaels Management-Affordable's first draw PPP loan, plus interest, in the amount of $2,576,544.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 1 percent of the loan amount, or at least $25,372.00.

39. On or about April 28, 2020, SBA approved a first draw loan to Prestige in the amount of $1,039,900.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Prestige represented that it had 50 employees. On or about August 17, 2021, SBA forgave Prestige's first draw PPP loan, plus interest, in the amount of $1,053,347.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 3 percent of the loan amount, or at least $31,197.00.

40. On or about April 28, 2020, SBA approved a first draw loan to MCSC in the amount of $873,000.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, MCSC represented that it had 95 employees. On or about August 17, 2021, SBA forgave MCSC's first draw PPP loan, plus interest, in the amount of $884,289.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 3 percent of the loan amount, or at least $26,190.00.

41. On or about April 15, 2020, SBA approved a first draw loan to TMO in the amount of $952,400.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, TMO represented that it had 64 employees. On or about August 17, 2021, SBA forgave TMO's first draw PPP loan, plus interest, in the amount of $964,925.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 3 percent of the loan amount, or at least $28,572.00.

42. On or about April 28, 2020, SBA approved a first draw loan to Michaels Hospitality in the amount of $238,200.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Michaels Hospitality represented that it had 27 employees. On or about August 17, 2021, SBA forgave Michaels Hospitality's first draw PPP loan, plus interest, in the amount of $241,280.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 5 percent of the loan amount, or at least $11,910.00.

43. On or about April 15, 2020, SBA approved a first draw loan to Student Living Management in the amount of $179,200.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Student Living Management represented that it had 8 employees. On or about August 17, 2021, SBA forgave Student Living Management's first draw PPP loan, plus interest, in the amount of $181,562.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 5 percent of the loan amount, or at least $8,960.00.

44. On or about April 28, 2020, SBA approved a first draw loan to Student Living in the amount of $551,900.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Student Living represented that it had 26 employees. On or about March 31, 2021, SBA forgave Student Living's first draw PPP loan, plus interest, in

the amount of $556,935.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 3 percent of the loan amount, or at least $16,557.00.

45. On or about April 28, 2020, SBA approved a first draw loan to Michaels Development in the amount of $761,200.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Michaels Development represented that it had 34 employees. On or about August 17, 2021, SBA forgave Michaels Development's first draw PPP loan, plus interest, in the amount of $771,043.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 3 percent of the loan amount, or at least $22,836.00.

46. On or about April 28, 2020, SBA approved a first draw loan to Continental Mortgage in the amount of $127,800.00 through Manufacturers and Traders Trust Company. On the application form for this loan, according to SBA data, Continental Mortgage represented that it had 6 employees. On or about July 6, 2021, SBA forgave Continental Mortgage's first draw PPP loan, plus interest, in the amount of $129,285.00. SBA also paid the loan processor, Manufacturers and Traders Trust Company, 5 percent of the loan amount, or at least $6,390.00.

47. Collectively, Defendants received $7,260,800.00 in first-draw PPP loan proceeds. Based on the forgiveness amounts presently identified in SBA data, SBA forgave, plus stated interest, at least $7,359,210.00 of those loans and paid at least $177,984.00 in lender processing fees. The nine applications reported employee counts totaling only 471, ranging from six to 161 persons. In fact, TMO affiliated companies had significantly more than 500 employees.

**<u>Fraud Allegations</u>**

**A. The Defendants Were Affiliates Of One Another.**

48. The Michaels Entities were affiliates of one another because at all times relevant to this Complaint, the Defendants operated as components of a unified, commonly controlled

corporate family known as The Michaels Organization. The Michaels Entities were subject to common control and common management, shared a common Camden headquarters, and shared common operational, administrative, and financial infrastructure. These shared management and administrative functions corroborate common control and required the borrowers to aggregate affiliate employees and receipts when determining PPP eligibility.

49. The Michaels Entities operated from a common corporate headquarters at or near 2 Cooper Street in Camden, New Jersey, to which TMO publicly stated it moved in June 2019. The same senior executives identified above directed the enterprise across its constituent entities.

50. TMO's own public materials described a single national enterprise with 53 years in business, operations in 39 states plus the District of Columbia and the United States Virgin Islands, 597 communities, more than 200,000 residents, more than 59,000 units under management, 76,000 developed units, an $8.8 billion development pipeline, and $12 billion in assets under management.

51. Well before the PPP applications, TMO's founder was reported to have grown The Michaels Organization into a company of 1,800 people, with six additional divisions, including a mortgage company and an equity syndicator. In May 2020, immediately after the first-draw application period, Affordable Housing Finance ranked The Michaels Organization as the nation's No. 1 affordable-housing owner.

52. These facts were neither remote nor unknown to the enterprise. They were the enterprise's own public representations of the scale, structure, and operations of the business whose constituent entities sought PPP loans as purportedly small and independent concerns.

53. A single retirement plan, titled "THE MICHAELS ORGANIZATION 401(K) PLAN," was sponsored by The Michaels Organization, LLC and administered through Great-West Life & Annuity. Public plan information identifies plan assets of $54,537,955 as of 2019. The

plan's Forms 5500 reported 1,838 active participants and 1,984 total participants for 2019, and 2,552 total participants for 2020. The plan further reported that its sponsor was a member of a controlled group under Internal Revenue Code § 414(b), (c), or (m).

54. The § 414 controlled-group representation and the SBA affiliation analysis are distinct legal tests, but the representation is powerful contemporaneous evidence of a unified controlled enterprise. Section 414 employs ownership-based thresholds, whereas SBA affiliation considers actual or potential control and is broader. A corporate family qualifying as a § 414 controlled group accordingly supplies strong evidence supporting SBA affiliation, even though not every SBA affiliation necessarily constitutes a § 414 controlled group.

55. MCSC's nonprofit status did not sever its affiliation with the other Defendants. For the financial-assistance rules applicable to PPP, SBA counted the employees, receipts, or alternative size measure of the concern at issue together with all of its domestic and foreign affiliates, whether or not those affiliates were organized for profit. 13 C.F.R. § 121.301(f)(3).

56. All nine applications were submitted to the same lender, M&T, and were approved on either April 15, 2020, or April 28, 2020. In addition, most of the loans were forgiven on exactly the same date – August 17, 2021. M&T was not an arm's-length, first-time PPP lender for the Michaels corporate family. Upon information and belief, before the PPP applications M&T financed the Camden waterfront apartment-and-office project known as 11 Cooper, the building that became TMO's headquarters and housed TMO and other office tenants. The coordinated timing and the use of the same preexisting commercial lender support the inference that Defendants' certifications and the decision to treat each constituent entity as a separate applicant were neither isolated nor inadvertent.

57. Ownership or control of more than fifty percent of an entity's voting equity establishes the power to control regardless of whether that power was actually exercised. Accordingly, each borrower was required to include the employees and receipts of its controlled affiliates. By reporting only its standalone employees, each borrower understated the size of the affiliated enterprise and falsely certified that it satisfied the applicable PPP size standard.

**B. The Defendants Did Not Qualify For Their PPP Loans Under Any Of The Applicable Eligibility Standards.**

58. Defendants did not qualify for their first-draw PPP loans under the generally applicable 500-employee standard and, upon information and belief, did not qualify under the applicable industry receipts or employee standards or the alternative size standard.

59. First, the employee counts reported on Defendants' nine first-draw PPP loan applications totaled only 471, and that fragmented sum materially understated the workforce of the affiliated enterprise. Because the borrowers were affiliates and no pleaded borrower qualified for a statutory affiliation waiver, their employees were required to be aggregated. The Forms 5500 for the single Michaels Organization 401(k) Plan reported 1,838 active participants and 1,984 total participants for 2019 and 2,552 total participants for 2020, and the enterprise was publicly described as a company of 1,800 people. Consequently, the borrowers did not qualify under the generally applicable 500-employee standard.

60. Second, Defendants together had far more in annual revenue than any revenue-based size standard that could have applied to them when they applied for their first draw PPP loans. Upon information and belief, the Michaels Entities' aggregated annual receipts exceeded the highest receipts-based size standard applicable to any borrower. This is supported by the enterprise's own public representations of $12 billion in assets under management, an $8.8 billion development pipeline, more than 59,000 units under management across 597 communities, and

operations in 39 states plus the District of Columbia and the United States Virgin Islands. Defendants therefore did not qualify under an applicable receipts-based standard.

61. Third, Defendants together had far more than $15 million in tangible net worth and, upon information and belief, far more than $5 million in average net income after tax for the two full fiscal years preceding March 27, 2020. MCSC's own Form 990 for the fiscal year ending March 31, 2020 reported total assets of $34,939,432, total liabilities of $3,630,654, and net assets or fund balances of $31,308,778. MCSC's reported net assets alone materially exceeded the $15 million alternative size threshold. When MCSC's resources are considered together with those of the other affiliated entities, Defendants' aggregated tangible net worth substantially exceeded the alternative pathway's maximum.

62. On the dates described above, each Defendant submitted, or caused to be submitted, a PPP application to M&T. Each application represented that the applicant was eligible for PPP assistance and contained certifications material to the SBA's approval and guarantee of the loan. The certifications were false because the Defendants were affiliates of one another, and their employees and other applicable size measures had to be aggregated. Defendants nevertheless sought, obtained, retained, and secured forgiveness of PPP funds.

63. The falsity continued into the loan-forgiveness process. In seeking and receiving forgiveness, Defendants caused M&T and SBA to treat the loans as validly issued PPP loans despite the original ineligibility and Defendants' failure to disclose the true size and affiliation of the enterprise. By receiving and retaining the proceeds of loans for which they were ineligible, and by obtaining forgiveness of those loans, Defendants avoided or decreased obligations to repay money to the United States.

64. Defendants acted knowingly. At a minimum, they acted in deliberate ignorance or reckless disregard of the truth or falsity of the certifications. Their senior leadership managed a longstanding, nationally scaled enterprise; the affiliated entities shared the Michaels name, a common headquarters, common executive leadership, a consolidated retirement plan, and coordinated access to the same lender at the same time.

65. These requirements were material to the Government's decision to guarantee, approve, disburse, and forgive PPP loans. SBA and M&T relied on Defendants' certifications and representations in approving, guaranteeing, disbursing, and forgiving the loans. Had Defendants accurately disclosed their affiliates and their aggregate workforce and financial size, the PPP loans would not have been approved as separate loans and the Government would not have guaranteed, funded, or forgiven them.

**<u>COUNT I</u>**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Claim)**

66. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

67. Through the acts set forth above, before at least or on or about April 15, 2020, through at least on or about November 23, 2021, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to SBA for their first-draw PPP loans and loan forgiveness to which they were not entitled, including PPP loan applications and loan-forgiveness applications submitted directly or through M&T.

68. By virtue of the false or fraudulent claims that Defendants knowingly made or presented, or caused to be made or presented, Defendants violated the False Claims Act, 31 U.S.C.

§ 3729(a)(1)(A), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(False Records)**

69. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

70. Through the acts set forth above, before at least or on or about April 15, 2020, through at least on or about November 23, 2021, Defendants knowingly made, used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims by SBA for their first-draw PPP loans and loan forgiveness to which they were not entitled, including PPP loan applications, eligibility certifications, supporting payroll and affiliation information, and loan-forgiveness submissions that concealed or misrepresented that Defendants were affiliates under SBA rules and that their employee counts and financial size had to be aggregated.

71. By virtue of the false records and statements Defendants made, used, or caused to be made or used, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT III**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**(Reverse False Claims)**

72. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

73. Through the acts set forth above, before at least or on or about April 15, 2020, through at least on or about November 23, 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G). After receiving PPP proceeds for which they were ineligible, Defendants knowingly concealed or knowingly and improperly avoided or decreased their obligation to repay those proceeds to the United States.

74. By virtue of the false or fraudulent claims that Defendants knowingly made or presented, or caused to be made or presented, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Prayer for Relief**

WHEREFORE, Relator demands and prays for the following relief:

1. That judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2. An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

3. An award to Relator of its costs and reasonable attorney fees for prosecuting this action; and

4. All other relief as may be required or authorized by law and in the interests of justice.

Dated: September 2, 2026

Respectfully submitted,

19 CATCH, LLC

By its attorney,

Peter Katz, Esq.
Law Offices of Peter Katz, LLC
5 Vaughn Drive, Suite 308
Princeton, New Jersey 08540
peter@pkatzlegal.com
(609) 244-0550